IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ONDOVA LIMITED COMPANY,       §
                              §
                Plaintiff,    §
                              § Civil Action No. 3:07-CV-0001-D
VS.                           §
                              §
MANILA INDUSTRIES, INC., et al.,§
                              §
                Defendants.   §

MEMORANDUM OPINION
AND ORDER

Plaintiff's motion to remand presents the principal questions whether certain defendants were precluded from removing this case by a forum selection clause and whether the sole nondiverse defendant was improperly joined.  Concluding that three defendants were prevented from removing the case but that the nondiverse defendant was improperly joined, the court grants the motion in part and denies it in part.

I

Defendant Munish Krishan ("Munish") is the owner and sole shareholder of defendant Manila Industries, Inc. ("Manila"). Before the events giving rise to this suit, Manila owned hundreds of thousands of automatically registered Internet domain names. For each name, Manila used the services of plaintiff Ondova Limited Company ("Ondova"), a domain name registrar, to register the name and provide the registry with the nameserver/IP address that Manila had designated as the web page to be associated with the domain

name.[1]   The relationship between Manila and Ondova is that of registrant-registrar and is governed by a Bulk Registration Agreement ("BRA") among Ondova, Munish, and Manila.[2]   Jeff Baron ("Baron") is the sole owner and employee of Ondova.

After the domain names were registered, Manila licensed them to defendant Netsphere, Inc. ("Netsphere") who, in turn, had an exclusive contract with Google Inc. ("Google").   Under this arrangement, both Netsphere and Google operated web pages that contained advertising links at various domains owned by Manila.[3] Each time a user clicks on an advertising link and is directed to the advertiser's website, the advertiser pays a fee.   Google, Netsphere, and Manila each received part of this "click-through" revenue.

Based on their registrant-registrar relationship, Manila and Ondova began to discuss forming a joint business for the purpose of obtaining favorable tax treatment.[4]   Ondova maintains that during

---

[1]A domain name registrar acts as the middleman between the registrant (the person who registers a domain name, e.g. Manila) and the .com/.net registry operator (the entity that houses the database of the nameservers/IP addresses for each .com/.net domain name registered).

[2]The original agreement, entered into in November 2004, was between Munish and Compana, LLC, the name under which Ondova was then doing business.   Munish later formed Manila and transferred his rights under the BRA to Manila.

[3]This arrangement is referred to as domain "parking."

[4]Ondova maintains that the discussions were not between "Manila and Ondova," but rather, were between Manila's owner,

these discussions, Munish stated that he was also acting on behalf of the following five friends and family members, whom Munish referred to as his "partners": Amir Asad ("Asad"), Biju Mathew ("Mathew"), Manish Aggarwal ("Aggarwal"), Amer Zaveri ("Zaveri"), and Rohit Krishan ("Rohit").  He also indicated that he wanted to structure the business so that at least two entities in which these individuals would have various percentage interests would own a significant part.   Manila and Ondova jointly hired a law firm specializing in corporate structure and tax planning to formulate an outline of the overall tax transaction and business structure (the "Proposed Transaction").   If effected, the Proposed Transaction would have been based in the U.S. Virgin Islands, involved multiple entities and assignments, and ultimately resulted in a beneficial co-ownership by Munish and Baron of certain domain names owned and registered by Manila.

One of the initial steps taken in anticipation of the joint business was the execution of a document ("Assignment Agreement") between Manila and an alleged Virgin Islands "shelf" company, HCB, LLC ("HCB").   Under the Assignment Agreement, Manila purported to assign to HCB all its domain names that as of the date of assignment were not subject to active claims.  After the Assignment Agreement was executed, however, the parties discovered problems with the proposed assignment, including that to obtain favorable

_____

Munish and Ondova's owner, Baron.

- 3 -

tax treatment, the domain names had to be transferred to a Virgin Islands company and that HCB was not, in fact, a Virgin Islands entity.  Manila maintains that the Assignment Agreement was never performed, and that Manila and Netsphere treated it as a nullity.

During the months that followed, Ondova continued to act as registrar for Manila's domain names.  Ondova repeatedly followed Manila's instructions about registering, renewing, transferring, and deleting Manila's domain names, including names that were subject to the Assignment Agreement, without objection from HCB. Manila alleges that although it and Ondova continued to discuss a possible joint venture after the Assignment Agreement fell through, they were unable to agree on the structure and terms of the overall deal.  Ondova contends that Baron and Munish reached an agreement on the essential terms of the new business structure, that the assignment and related documents were effective, and that Munish repeatedly acknowledged both the fact of an agreement and the effectiveness of the assignment.

Nearly one year after the Assignment Agreement was executed, HCB, purportly acting as assignee of Manila's domain names, gave Ondova instructions regarding the domain names.  Ondova followed HCB's instructions and reported to the .com/.net registry operator that the nameservers/IP addresses for all of Manila's domain names had changed from the IP address associated with the Google parking service webpages to a new IP address associated with another

- 4 -

parking service.   Ondova was able to make these changes because only the registrar is authorized to communicate with the registry concerning the nameserver/IP address for a domain name.   It is alleged that the change in domain names has resulted in a significant loss of click-through revenue to Manila, Netsphere, and Google.

Ondova filed the instant suit in Texas state court, alleging that it could not fulfill its obligations as registrar without accurate information.   It also sought a declaratory judgment under the Texas Declaratory Judgments Act, Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-37.011 (Vernon 1997), specifying the ownership of the domain names and Ondova's resulting obligations, so that it could accurately perform its duties of registration and renewal. Ondova asserted in its amended complaint[5] that it believed the domain names had been transferred, sold, or assigned to HCB and/or to Realty Investment Management, LLC ("RIM").   It averred that Netsphere was claiming ownership of the domain names or control over them, and that the individual defendants, including both Munish and Rohit, were the owners and decisionmakers of Manila and Netsphere.   Netsphere, Munish, Aggarwal, and Zaveri removed this

---

[5]In accordance with Texas procedure, Ondova filed an amended "petition" in state court.  For clarity, the court will refer to it as an amended "complaint."

case to this court, contending that Rohit was improperly joined[6] and that his citizenship should be disregarded for diversity purposes, so that the court has subject matter jurisdiction based on diversity of citizenship.[7]

The day after Ondova filed suit in Texas state court, Manila, Netsphere, and Munish filed a similar lawsuit in federal court in California.  They sought, *inter alia*, a declaratory judgment that Manila is the sole owner of all rights, title, and interest the registered domain names that are the subject of this suit; that Netsphere is the sole owner of all rights, title, and interest in its intellectual property; and that Baron, Ondova, HCB, and RIM do not have any ownership or interest either in Manila's domain names or in Netsphere's intellectual property.  The California court dismissed the claims against Ondova and Baron and transferred the

---

[6]Defendants use both the former term "fraudulently joined" and the current term "improperly joined" in their brief.  In this circuit, the term "fraudulent joinder" has been replaced by "improper joinder."  *Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 571 n.1 (5th Cir. 2004) (en banc) ("We adopt the term 'improper joinder' as being more consistent with the statutory language than the term 'fraudulent joinder,' which has been used in the past.  Although there is no substantive difference between the two terms, 'improper joinder' is preferred.").

[7]One week later, the same removing defendants, joined by Manila and Asad, filed a motion to dismiss based on lack of subject matter jurisdiction, lack of personal jurisdiction, and improper venue, but they later withdrew the motion to dismiss with respect to all issues raised except the dismissal of Manila for improper service.

remaining actions against HCB and RIM to this court.[8]

After defendants removed the case, Ondova moved to remand, arguing that the notice of removal was defective because the parties filing it had affirmatively disclaimed federal jurisdiction, three of the defendants had waived their right of removal, and the removing defendants had failed to meet their burden of establishing diversity jurisdiction under the doctrine of improper joinder and party realignment. On the same day it filed its motion to remand, Ondova also filed a notice of dismissal without prejudice of its claims against Aggarwal, Zaveri, and Asad. The effect of this dismissal is that the only remaining defendants are Manila, Netsphere, Munish, Mathew, Rohit, HCB and RIM. Manila, Netsphere, and Munish have responded to Ondova's motion, and Ondova has filed a reply.[9]

II

Under 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the

---

[8]HCB also has an action pending against Manila, Munish, Ondova, Baron, and Netsphere in federal court in the Virgin Islands. That suit involves similar ownership issues as were asserted in the Texas state court suit.

[9]Defendants have filed a March 23, 2007 motion to strike Ondova's reply brief appendix. Because the court has decided Ondova's motion to remand without considering the evidence contained in the appendix, it denies the motion to strike as moot.

defendants." This statute, however, "is subject to strict construction because a defendant's use of that statute deprives a state court of a case properly before it and thereby implicates important federalism concerns." *Frank v. Bear Stearns & Co.*, 128 F.3d 919, 922 (5th Cir. 1997). Thus defendants bear the burden of demonstrating that federal jurisdiction exists, and courts resolve any doubts concerning removal in favor of remand. *See, e.g., Cantwell v. Deutsche Bank Secs., Inc.*, 2005 WL 2296049, at *2 (N.D. Tex. Sept. 21, 2005) (Fitzwater, J.) (citing *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1408 (5th Cir. 1995); *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002)).

III

A

Defendants removed this case based on diversity jurisdiction and, one week later, filed a motion to dismiss, alleging that the court lacked subject matter jurisdiction to hear the declaratory judgment action because there was no case or controversy, as required by the Declaratory Judgment Act. Ondova cites 28 U.S.C. § 1447(c), which provides that, if at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case must be remanded, and it argues that by asserting that this court lacks subject matter jurisdiction because there is no case or controversy, defendants expressly advocated a position that requires remand, if accepted. Contending that

defendants "affirmatively disclaimed" federal jurisdiction, Ondova asserts that the notice of removal is defective.

Defendants respond that they did not move to dismiss because of a lack of federal jurisdiction; rather, they based their motion on a lack of jurisdiction to adjudicate a declaratory judgment action in the absence of a case or controversy.  Defendants also point out that they have now withdrawn their motion to dismiss, thereby mooting Ondova's arguments.

Ondova replies that defendants' motion to dismiss is, in fact, a motion to dismiss for lack of subject matter jurisdiction.  It points to language in the motion that expressly refers to "lack of subject matter jurisdiction," and it argues that the Declaratory Judgment Act is not an independent basis for federal jurisdiction. Ondova maintains that defendants' withdrawal of their motion was not prompted by an amendment to the pleadings or a change in defendants' understanding of the relevant facts, and that defendants judicially admitted in their motion and brief that this court lacks jurisdiction, and they have not disclaimed the omissions in withdrawing their motion.  Ondova asks the court to take judicial notice of the "withdrawn" motion to dismiss and defendants' admissions and remand this action to state court.

B

Ondova's argument lacks force.  A defendant can remove a case to federal court based on diversity jurisdiction and then move to

dismiss based on the absence of a case or controversy. Essentially, a defendant who is statutorily entitled to remove a case to federal court has the right to have the federal tribunal decide its motion to dismiss. The fact that the party intends following removal to assert that there is no case or controversy sufficient to support jurisdiction does not prevent removal.

Accordingly, the court holds that defendants did not relinquish the right of removal, or of federal-court removal jurisdiction, by removing the case based on diversity of citizenship and then moving for dismissal based on the absence of a case or controversy.

Plaintiffs cite 28 U.S.C. § 1447(c), which provides that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded," arguing that remand is required because, in their withdrawn motion to dismiss, defendants admitted facts that establish there is no case or controversy. Section 1447(c) is inapposite, however, because the court has not determined that it lacks subject matter jurisdiction. Even if the court decides there is no case or controversy sufficient to support entry of a declaratory judgment, that does not of itself deprive the court of diversity jurisdiction.[10]

---

[10]Additionally, defendants have withdrawn their motion to dismiss.

IV

A

Ondova also maintains that Manila and Munish have waived their right of removal by entering into the BRA, which contains the following forum selection clause:

> In the event that any dispute shall occur between the parties arising out of or resulting from the construction, interpretation, enforcement, or any other aspect of this Agreement, the parties hereby agree to accept the exclusive jurisdiction of any Court of competent jurisdiction sitting in and for the County of Dallas.

P. App. 66. Ondova maintains that there is no serious dispute that this case involves the BRA, because Ondova seeks a declaration "specifying the ownership of the domain names and Ondova's resulting obligations." P. App. 14. Further, Ondova points to the related California suit, in which the court held that the BRA applied to Munish and Manila, and also to Netsphere, because of its business relationship to the signatories. Ondova argues that Munish, Manila, and Netsphere are collaterally estopped by the California court's decision from relitigating the waiver issue in this court. It maintains that the phrase "in and for the County of Dallas" clearly refers to *state* courts in Dallas County, and does not refer to *federal* court.

Defendants respond that the BRA is inapplicable to the present controversy, which is essentially an ownership dispute between Manila and HCB. They maintain that the present dispute arises out

- 11 -

of the Proposed Transaction, which, had it been completed, would have resulted in the transfer of several hundred thousand domain names from Manila to HCB; that ownership of the domain names does not depend on the construction or interpretation of any term in the BRA, rather, the entire dispute centers around whether the Proposed Transaction was effective; and to determine this question, the court need not construe, interpret, or enforce any provision of the BRA.

Defendants also contend that collateral estoppel does not prevent them from litigating whether the forum selection clause in the BRA applies. They argue that the issue to which Ondova seeks to apply collateral estoppel is whether the forum selection clause applies to Ondova's declaration-of-ownership claim, and this specific issue was not litigated before the California court. Defendants reason that in the California suit, the *registrant* (Manila), not the *registrar* (Ondova), was seeking a declaration that it owned the domain names and that there are factual scenarios in which terms in the BRA might have affected the outcome (e.g., certain breaches by a registrant might result in the registrar's taking an interest in a domain name). Defendants contend that because in this lawsuit Ondova has expressly disclaimed ownership interest in the domain names, and has specifically stated that it believes HCB owns the domain names, Ondova has negated any dispute between it and Manila regarding domain name ownership. Defendants

therefore argue that because Ondova has taken itself out of the ownership dispute, it has removed any possible applicability of the BRA, which governs relations between Ondova and Manila.  Finally, defendants posit that even if the BRA were found to apply to this dispute, the forum selection clause does not preclude removal of this case to federal court.  It argues that the language "in and for the County of Dallas" is not clear and unequivocal, and cannot be construed as a waiver of removal rights under Fifth Circuit precedent.

Ondova replies that it seeks a declaration regarding its "resulting obligations" to the party ultimately declared to control the domain names, arguing that the BRA will necessarily be implicated in that determination.  It argues that the distinction between the California case——in which the court was presented with the question whether Manila owned the domain names (because Manila sought that declaration)——and the present case——which presents the issue whether Manila owns the domain names (because Ondova has disclaimed ownership of them and contends that they were transferred to HCB)——is a distinction without a difference.  It maintains that the doctrine of collateral estoppel prevents the parties from relitigating the applicability of the forum selection clause.  Finally, in response to defendants' argument that the phrase "in and for the county of Dallas" does not refer exclusively to state courts in Dallas county, Ondova cites *First National of*

*North America, LLC v. Peavy*, 2002 WL 449582, at *2, (N.D. Tex. Mar. 21, 2002) (Kaplan, J.), in which Judge Kaplan explained, "where a forum selection clause merely designates a particular county, venue lies only in the state courts in that county." *Id.* Ondova argues that *First National* is squarely on point and dictates that the forum selection clause limits jurisdiction to Dallas County state courts.

B

The court decides first whether the parties are collaterally estopped from litigating the question of waiver.

1

Under the doctrine of "collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)). The preclusive effect of a prior federal court judgment is controlled by federal collateral estoppel jurisprudence. *See Avondale Shipyards, Inc. v. Insured Lloyd's*, 786 F.2d 1265, 1269 n.4 (5th Cir. 1986) ("We apply federal law to the question of the *res judicata* or collateral estoppel effect of prior federal court proceedings, regardless of the basis of federal jurisdiction in either the prior or the present action." (citing *Freeman v. Lester Coggins Trucking, Inc.*, 771 F.2d 860, 862

(5th Cir. 1985))).   Under federal law, the doctrine of collateral

estoppel applies only if three elements exist:

> (1) the issue at stake must be identical to
> the one involved in the prior action; (2) the
> issue must have been actually litigated in the
> prior action; and (3) the determination of the
> issue in the prior action must have been a
> necessary part of the judgment in that earlier
> action.

*RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1290 (5th Cir. 1995)

(citing *In re Davis*, 3 F.3d 113, 114 (5th Cir. 1993)).

2

It is undisputed that the question whether the BRA waived the

right of removal was "actually litigated" in the California

proceedings and that the application of the BRA was a necessary

part of the court's judgment dismissing Manila's claims against

Ondova.   Accordingly, in deciding whether the doctrine of

collateral estoppel bars the parties from litigating the question

of waiver, the court focuses on whether the issue sought to be

precluded from relitigation is identical to that decided in the

California case.

Manila, Netsphere, and Munish filed suit in the California

federal court seeking a declaration that Manila is the sole owner

of all rights, title, and interest in its registered domain names,

and asserting a claim against Ondova for conversion of the domain

names.   The California court concluded that venue was improper

because of the BRA.   It explained that

- 15 -

> the tort claims occurred during the course of
> a contractual relationship, and the nature of
> the parties' contractual relationship is
> central to resolving the questions of
> liability related to the parties' subsequent
> actions.  The ownership of the domain names
> and the obligations of the parties are
> outlined in this agreement.  Any question of
> conversion or rightful ownership of the domain
> names necessarily will involve interpretation
> of the Bulk Registration Agreement to
> determine the proper actions, duties, and
> obligations of the parties involved.  Thus,
> the tort claims at issue fall under the forum
> selection clause.

P. App. 79-80.  Concluding that the BRA applied to the dispute, the
court then held that, although Netsphere did not sign the
agreement, the BRA bound Netsphere nonetheless.  The court held
that, because Netsphere claimed rights to the domain names and
acted under the BRA by sending money to Ondova on its own behalf
for domain registrations, "Netsphere's actions were 'so closely
related to the contractual relationship' that the forum selection
clause applie[d] to it as well."  *Id.* at 80 (citing *Manetti-Farrow,
Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988)).

The California court centered its analysis of the application
of the BRA on the tort claim for conversion that Manila asserted
against Ondova.  It determined that the BRA would be relevant in
determining whether Ondova in fact converted Manila's domain names,
and it held that "the tort claims at issue fall under the forum
selection clause."  *Id.*  In the present case, there are no tort
claims asserted against Ondova.  Thus the question presented is

- 16 -

whether the BRA applies to Ondova's declaratory judgment action against Manila and Netsphere, which is different from the one the California court addressed: whether the BRA applied to Manila/Netsphere's tort claims against Ondova. Because the present case involves no tort claim for conversion, collateral estoppel does not preclude the parties from litigating whether the BRA applies to this case.

The doctrine of collateral estoppel does preclude the parties, however, from relitigating whether the BRA binds Netsphere, even though Netsphere is not a signatory to the contract. The presence or absence of a tort claim against Ondova has no bearing on the determination whether Netsphere was "so closely related to the contractual relationship" that the BRA's forum selection clause applies to it as well. The court decided in the California case Netsphere's relation to the contractual relationship and the binding nature of the BRA on Netsphere. Accordingly, the court holds that this issue has been heard and finally decided, and Netsphere cannot relitigate this question in this case.

C

The court now addresses whether the BRA's forum selection clause applies in this case.

1

The court need not discuss at length the law of forum selection clauses. It is undisputed that the forum selection

clause at issue here is mandatory, and defendants do not argue against enforcement on the basis that it is unenforceable, i.e., that it is unreasonable under the circumstances. The single question presented is whether Ondova's claim for a declaratory judgment falls within the scope of the forum selection clause.

In determining whether the forum selection clause applies, the court will assume not only that "[f]ederal law governs the determination of whether an enforceable forum selection clause exists[,]" *Aerus LLC v. Pro Team, Inc.*, 2005 WL 1131093, at *1 (N.D. Tex. May 9, 2005) (Lynn, J.) (citing *Haynsworth v. The Corp.*, 121 F.3d 956, 962 (5th Cir. 1997)), but also that federal law controls whether Ondova's lawsuit falls within the scope of the forum selection clause, *see Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 497 (9th Cir. 2000) ("In diversity cases, federal law governs the analysis of the effect and scope of forum selection clauses.").

2

"The court must examine the language of the contract to determine which causes of action are governed by the forum selection clause." *Aerus*, 2005 WL 1131093, at *7 (citing *Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 222 (5th Cir. 1998); *Soil Bldg. Sys. v. CMI Terex Corp.*, 2004 WL 1283966, at *5 (N.D. Tex. June 9, 2004) (Fish, C.J.)). "If the substance of the plaintiff's claims, stripped of their labels, does not fall

within the scope of the forum selection clause, the clause cannot apply." *Id.* (citations, emphasis, and brackets omitted).

Here, the forum selection clause applies to disputes "arising out of or resulting from the construction, interpretation, enforcement, or any other aspect of" the BRA.  P. App. 66.  Ondova has requested a declaration specifying "the ownership of the domain names and Ondova's resulting obligations."  Am. Compl. ¶ 20.  If the court decides that Manila owns the domain names, it will necessarily use the BRA to determine Ondova's "resulting obligations," because this contract outlines Ondova's various duties and obligations.  Under the broad language of the BRA, a determination of Ondova's resulting obligations under the BRA would certainly involve "any other aspect of the [BRA]."  P. App. 66.

Accordingly, the court holds that the forum selection clause applies to Ondova's declaratory judgment claim.  Because collateral estoppel prevents defendants from relitigating the question whether Netsphere is also bound by the BRA, the court concludes that Munish, Manila, and Netsphere are all bound and cannot remove this case if the result is that it will be heard in a court other than one "of competent jurisdiction sitting in and for the County of Dallas."  P. App. 66.

3

The court holds that the forum selection clause does not permit suit in this court.  Defendants argue that the phrase "in

and for the County of Dallas" is not sufficiently "clear and unequivocal" to effect a waiver of the right of removal. They appear to contend that this phrase could refer either to state or federal court, so long as the court is located in Dallas County. The court disagrees.

It is settled in the Fifth Circuit that "[a] party to a contract may waive a right of removal provided the provision of the contract makes clear that the other party to the contract has the 'right to choose the forum' in which any dispute will be heard." *Waters v. Browning-Ferris Indus., Inc.*, 252 F.3d 796, 797 (5th Cir. 2001) (quoting *City of Rose City v. Nutmeg Ins. Co.*, 931 F.2d 13, 16 (5th Cir. 1991)). "Because the forum selection clause is part of a contract, principles of contract interpretation apply." *IMCO Recycling, Inc. v. Warshauer*, 2001 WL 1041799, at *3 (N.D. Tex. Aug. 31, 2001) (Fitzwater, J.) (citing *McDermott Int'l, Inc. v. Lloyds Underwriters of London*, 944 F.2d 1199, 1205 (5th Cir. 1991)).

The court holds that the phrase "in and for the County of Dallas" clearly refers to state courts located in Dallas county. This court has previously explained that "venue in the federal system is stated in terms of judicial districts, not counties." *First Nat'l*, 2002 WL 449582, at *2. This court is referred to as the "United States District Court for the Northern District of Texas;" never as "for the County of Dallas." The use of the word

"for" in the phrase "United States District Court for the Northern District of Texas" signifies the jurisdiction of this court: all counties located in the Northern District of Texas.  No federal court sits "in and for the County of Dallas."  This court in fact includes 100 counties.  *See* 28 U.S.C. § 124(a)(1)-(7).  In contrast, Texas district courts are divided among the counties of Texas, and each court has jurisdiction over one or more specific counties.

Furthermore, "where a forum selection clause merely designates a particular county, venue lies only in the state courts in that county." *First Nat'l*, 2002 WL 449582, at *2 (citing *Excell, Inc. v. Sterling Boiler & Mech., Inc.*, 106 F.3d 318, 321 (10th Cir. 1997) ("Because the language of the clause refers only to a specific county and not to a specific judicial district, we conclude venue is intended to lie only in state district court."); *Docksider, Ltd. v. Sea Tech., Ltd.*, 875 F.2d 762, 764 (9th Cir. 1989) (finding state court in Gloucester County, Virginia to be exclusive forum when contract clause stated "[v]enue of any action brought hereunder shall be deemed to be in [Gloucester County,] Virginia"); *Genesis Servs. Group, Inc. v. Culi-Servs., Inc.*, 1999 WL 1939986, at *2 (E.D.N.C. Mar. 30, 1999)).  From the plain language of the forum selection clause, the court holds that the proper venue for Ondova's claims against Manila, Munish, and Netsphere is in state court in Dallas County, Texas.

- 21 -

Accordingly, the court grants Ondova's motion to remand its declaratory judgment action against Munish, Manila, and Netsphere.

V

The court addresses next whether it has diversity jurisdiction over Ondova's claims against the remaining defendants.

A

It is settled that diversity jurisdiction requires complete diversity of citizenship between all plaintiffs and all defendants. *See Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373-74 (1978); *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806). "This means that no plaintiff can be a citizen of the same state as even one defendant." *Davis v. Am. Home Prods*., 2005 WL 910601, at *2 (N.D. Tex. Apr. 20, 2005) (Fitzwater, J.).   Both Ondova and Rohit are citizens of Texas.   Thus unless the court can disregard Rohit's citizenship, it lacks complete diversity because there are Texas citizens on both sides of the docket.[11]

---

[11]Defendants also maintain in their notice of removal that the court can disregard *Ondova's* citizenship because Ondova is not the real party in interest.   They point out that although Ondova has pleaded its claim as one for a declaration of ownership rights, Ondova itself has not asserted any legal interest in the domain names and merely alleges that it "cannot fulfill its obligations as registrar without accurate information" regarding ownership of the names.   Am. Compl. ¶ 17.   Defendants maintain that the rival claimant to the domain names, HCB, is the real party in interest and the party whose citizenship is relevant for determining diversity.   Because, as the court explains below, there is complete diversity between Ondova and the defendants who are properly joined, the court need not address this argument.

B

        In their notice of removal, defendants argue that Rohit is
improperly joined because Ondova cannot establish a cause of action
against him.   They argue that the only defendants who hold any
direct ownership or possessory interest, and are alleged to claim
any ownership or possessory interest, in the domain names are the
corporate entities, Manila and Netsphere.   Defendants argue that
Rohit has been improperly joined because he is merely a Netsphere
shareholder and asserts no personal interest in the domain names
apart from his ownership of Netsphere shares.

        Ondova maintains that defendants have not met their burden of
establishing that there is no possibility that Ondova will be able
to establish a cause of action against Rohit in state court.
Ondova posits that its principal, Baron, negotiated and reached an
agreement with Munish about the essential terms of a structure in
which Rohit and others (whom Munish called "partners") would have
ownership interests in the new business arrangements concerning the
domain names.   Ondova also maintains in its amended complaint that
Munish, Rohit, and their associates have "continually threatened,
harassed, and interfered with Plaintiff's business in an effort to
bully their way into ownership and control of the names."   Am.
Compl. ¶ 17.   Ondova contends that "it has become virtually
impossible for [Ondova] to operate its business and fulfill its
obligations as registrar."   *Id.*   Ondova therefore argues that Rohit

is properly joined because he allegedly has a possible ownership, possessory, or financial interest in the domain names, and because, as a result of that interest, he allegedly participated in harassment and interference with Ondova's business.

Defendants respond that Ondova cannot establish a claim against Rohit. They maintain that because Ondova's claims are for declarations regarding ownership and control of the domain names, and because the only named defendants who hold any direct interest and are alleged to claim any interest in the domain names are the corporate entities Manila and Netsphere, the court should disregard Rohit's citizenship. Defendants argue that Rohit's only claim to an interest in the domain names is indirect, as a shareholder of Netsphere (which is a licensee of the names); that Rohit's status as a Netsphere shareholder is insufficient to establish a genuine conflict between Ondova and Rohit, because ownership of corporate assets is vested in the corporation itself and not in its stockholders; and that the only two outcomes of this litigation are a declaration that Manila owns the domain names or that HCB owns the domain names, and in no circumstance can Rohit own them.

Ondova replies that the business arrangement among the parties contemplated that Rohit would be one of Munish's partners and would therefore have an ownership interest in the domain names. Ondova maintains that it cannot rely on Rohit's bare assertion that he will not claim an interest in the domain names.

C

"The doctrine of improper joinder . . . entitle[s] a defendant
to remove to a federal forum unless an in-state defendant has been
'properly joined.'" *Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d
568, 573 (5th Cir. 2004) (en banc).  "When a defendant removes a
case to federal court on a claim of improper joinder, the district
court's first inquiry is whether the removing party has carried its
heavy burden of proving that the joinder was improper." *Id.* at
576.  Improper joinder is established by showing that there was
either actual fraud in the pleading of jurisdictional facts or that
the plaintiffs are unable to establish a cause of action against
the non-diverse defendant in state court. *Id.* at 573 (citing
*Travis v. Irby*, 326 F.3d 644, 647 (5th Cir. 2003)).

Under the second alternative——the one at issue in this
case——the test for improper joinder "is whether the defendant has
demonstrated that there is no possibility of recovery by the
plaintiff against an in-state defendant, which stated differently
means that there is no reasonable basis for the district court to
predict that the plaintiff might be able to recover against an
in-state defendant." *Id.*  A plaintiff's joinder of formal or
unnecessary parties cannot defeat diversity jurisdiction and
prevent removal. *Pesch v. First City Bank of Dallas*, 637 F. Supp.
1530, 1536 (N.D. Tex. 1986) (Fitzwater, J.) (citing *Salem Trust Co.
v. Mfr.'s Fin. Co.*, 264 U.S. 182, 189 (1924); *Nunn v. Feltinton*,

- 25 -

294 F.2d 450, 453 (5th Cir. 1961)).

There are two "proper means for predicting whether a plaintiff has a reasonable basis of recovery under state law." *Smallwood*, 385 F.3d at 573.

> The court may conduct a Rule 12(b)(6)-type
> analysis, looking initially at the allegations
> of the complaint to determine whether the
> complaint states a claim under state law
> against the in-state defendant. Ordinarily,
> if a plaintiff can survive a Rule 12(b)(6)
> challenge, there is no improper joinder.

*Id.* (footnote omitted). In cases where "a plaintiff has stated a claim, but has misstated or omitted discrete facts that would determine the propriety of joinder . . . the district court may, in its discretion, pierce the pleadings and conduct a summary inquiry." *Id.* The decision to conduct such an inquiry rests within the discretion of the trial court and "is appropriate only to identify the presence of discrete and undisputed facts that would preclude plaintiff's recovery against the in-state defendant." *Id.* at 573-74. "The party seeking removal bears a heavy burden of proving that the joinder of the in-state party was improper." *Id.* at 574.

### D

Ondova's only claim in this action is for a declaration under the Texas Declaratory Judgments Act ("DJA") resolving the ownership of the domain names and Ondova's rights and obligations with

- 26 -

respect to these domain names.[12]   The DJA gives Texas courts the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed."  Tex. Civ. Prac. & Rem. Code § 37.003 (Vernon 1997).   The stated purpose of the DJA "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered."  Tex. Civ. Prac. & Rem. Code § 37.002 (Vernon 1997).   "When declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties.  A declaration does not prejudice the rights of a person not a party to the proceeding."   Tex. Civ. Prac. & Rem. Code § 37.006(a) (Vernon 1997).

Although Texas courts liberally construe the DJA, they limit its application to those cases in which there is an actual case or controversy between the parties.  *See Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995).   "A declaratory judgment is

---

[12]Ondova filed its claim in Texas state court under the Texas Declaratory Judgments Act.   "When a declaratory judgment action filed in state court is removed to federal court, that action is in effect converted into one brought under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202."  *Redwood Resort Props., LLC v. Holmes Co.*, 2007 WL 1266060, at *4 (N.D. Tex. Apr. 30, 2007) (Fitzwater, J.) (citing *i2 Techs. US, Inc. v. Lanell*, 2002 WL 1461929, at *7 n.5 (N.D. Tex. July 2, 2002) (Fish, C.J.)). Although this is the usual rule, in this case, the question is whether Ondova can state a claim against Rohit in state court. Therefore, because the question is improper joinder, the court must analyze the claim under Texas rather than federal law.

appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought." *Id.* (citing *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). "To constitute a justiciable controversy, there must exist a real and substantial controversy involving genuine conflict of tangible interests and not merely a theoretical dispute." *Bexar-Medina-Atascosa Counties Water Control & Improvement Dist. No. 1 v. Medina Lake Prot. Ass'n*, 640 S.W.2d 778, 779-80 (Tex. App. 1982, writ ref'd n.r.e.). Texas courts do not have the authority to render judgments that merely constitute advisory opinions. *Patterson v. Planned Parenthood of Houston & S.E. Tex., Inc.*, 971 S.W.2d 439, 443 (Tex. 1998). Courts cannot review hypothetical or contingent situations, or determine questions not currently essential to the decision of an actual controversy. *Firemen's Ins. Co. of Newark v. Burch*, 442 S.W.2d 331, 333 (Tex. 1968).

E

To decide whether Rohit is improperly joined, the court assesses the allegations in Ondova's amended complaint to determine whether there is real controversy between Ondova and Rohit that would support a finding that Ondova has stated a claim for relief under the DJA. *See Smallwood*, 385 F.3d at 573. The only allegations that Ondova makes that could be construed as asserted

against Rohit are that "Ondova is informed and believes that Defendant NetSphere is either claiming ownership of the domain names or control over them.  The individual defendants . . . and Rohit Krishan are, on information and belief, the owners and decision makers of both Defendant Manila and Defendant NetSphere," Am. Compl. ¶ 16, and that "Defendants Manila, NetSphere, and the individual defendants have all continually threatened, harassed, and interfered with Plaintiff's business in an effort to bully their way into ownership and control of the names," *id.* at ¶ 17. Based on the pertinent averments in the amended complaint, it is apparent that Rohit's role in this litigation arises solely from his status as a Netsphere shareholder.

Ondova alleges that *Netsphere* is the party claiming ownership or control of the domain names and that Rohit is an owner or decisionmaker of Netsphere.  Even if the court determines that Rohit is an owner-decisionmaker of Netsphere, this would not resolve whether Rohit individually is the owner of Netsphere's property.  Under Texas law, "ownership of the corporate assets is vested in the corporation itself and not in its stockholders." *McAlister v. Eclipse Oil Co.*, 98 S.W.2d 171, 176 (Tex. 1936).  So an allegation that Netsphere, the corporation, is asserting ownership over the domain names is not tantamount to an assertion that Netsphere's *owners* are claiming ownership.  Therefore, viewed favorably to Ondova under the improper joinder standard, the

allegation that the individual defendants——including Rohit——have "threatened, harassed, and interfered with [Ondova's] business in an effort to bully their way into ownership and control of the names," does not permit the court to infer that Rohit is seeking ownership of the domain names independent of his capacity as a Netsphere shareholder.[13]  Ondova nowhere alleges that Rohit claims ownership of the domain names in his individual capacity. Additionally, as the case is currently pleaded, there is no circumstance under which the court would determine that Rohit is the rightful owner of the domain names.   In fact, the *only* defendants Ondova alleges might have a claim to the domain names, and who therefore have a direct interest in the declaratory judgment action, are the corporate defendants Manila, Netsphere, HCB, and/or RIM.

      To determine whether a party is improperly joined, the court examines the relationship between the plaintiff and the nondiverse defendant (here, between Ondova and Rohit).  Ondova does not allege that Rohit asserts that he is an owner of the domain names in his individual capacity.  Ondova does not seek any declaration against Rohit beyond the declaration that one of the corporate defendants is the owner of the domain names.  Furthermore, because Netsphere

_____

      [13]Rohit could, of course, claim that he owns the domain names in his *individual* capacity rather than as an owner, shareholder, and officer of Netsphere.   But Ondova does not advance this allegation in its amended complaint.

- 30 -

is a corporation, and since Ondova has not pleaded any corporate-veil-piercing theory, Rohit, who is merely a Netsphere shareholder, is improperly joined.

The court therefore concludes that there is no case or controversy between Ondova——the registrar of the domain names——and Rohit——a shareholder of a corporation that allegedly claims ownership of the domain names.  Ondova does not allege that Rohit, himself, is claiming to own the domain names, and defendants maintain that Rohit is not asserting an individual interest in the domain names.  Accordingly, the court holds that Rohit has been improperly joined and his citizenship may be disregarded in determining whether there is complete diversity.  *See Smallwood*, 385 F.3d at 573.  When Rohit's citizenship is disregarded, there is complete diversity.  Thus defendants have met their burden of establishing that this court has diversity jurisdiction among the parties who have been properly joined.

*      *      *

For the foregoing reasons, the court grants in part Ondova's January 29, 2007 motion to remand. The court concludes that Ondova's actions against Manila, Munish, and Netsphere must be remanded to the 68th Judicial District Court of Dallas County, Texas. The clerk of court shall effect the remand of the case against these three defendants according to the usual procedure. The court denies Ondova's motion to remand its actions against Mathew, Rohit, HCB, and RIM.

**SO ORDERED.**

June 26, 2007.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 32 -